FILED
CLERK, U.S. DISTRICT COURT

JUN - 7 2007

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Priority ✓
Send ✓
Enter ___
Closed ___
JS-5/JS-6 ___
JS-2/JS-3 ___
Scan Only ___

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| REVEREND FATHER VAZKEN MOVSESIAN, et al.,<br><br>                    Plaintiffs,<br><br>vs.<br><br>VICTORIA VERSICHERUNG AG, et al.,<br><br>                    Defendants. | Case No.  CV-03-09407 CAS (MCx)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT MUNICH RE'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |

## I.   INTRODUCTION

This is a class action arising out of disputes relating to policies of life insurance. Plaintiffs Reverend Father Vazken Movsesian, Garo Ayaltin, Harry Arzomanian, Miran Khagerian and Ara Khajerian (collectively "plaintiffs") allege that they are persons of Armenian descent who are the rightful beneficiaries of insurance policies owned by their ancestors, who resided in the former Ottoman empire, which policies were allegedly issued by defendants.  Plaintiffs filed a second amended complaint on June 22, 2006, alleging claims, on behalf of themselves and others similarly situated,



DOCKETED ON CM

JUN - 7 2007

BY ___ 010



1   for (1) breach of written contract, (2) breach of the covenant of good faith and fair

2   dealing, (3) unjust enrichment, and (4) constructive trust.  Plaintiffs rely upon section

3   354.4(c) of the California Code of Civil Procedure, which extends the applicable

4   statute of limitations for claims arising out of life insurance policies issued between

5   1875 and 1923 to persons of Armenian or other ancestry living in the Ottoman Empire

6   during the period of 1915 to 1923.

7         On November 1, 2006, defendant Munchener Ruckversicherungs-Gesellschaft

8   Aktiengesellschaft ("Munich Re") filed the instant motion to dismiss plaintiffs' second

9   amended complaint.  Plaintiffs filed an opposition on November 28, 2006.[1]  On

10   December 11, 2006, Munich Re filed a reply.

11         On December 18, 2006, the Court heard oral argument on Munich Re's motion.

12   The Court reserved its judgment on the motion until such time as the California

13   Attorney General's Office indicated whether it intends to file a brief regarding its

14   position on the matter.  On March 19, 2007, the parties informed the Court that the

15   California Attorney General does not intend a file an amicus brief.

16         On March 29, 2007, the Court issued a tentative minute order with respect to

17   Munich Re's motion.  In addition, the Court directed the parties to file supplemental

18   briefs responding to the issues raised by the Court's tentative order, in particular the

19   issue of whether section 354.4 is preempted under the foreign affairs doctrine.  On

20   May 14, 2007, Munich Re filed its supplemental brief.  On May 21, 2007, plaintiffs

21   filed their supplemental opposition.  On May 30, 2007, Munich Re filed a

22

23

24        [1]Munich Re also filed a request for judicial notice as to California Senate Bill No.

25   1915, as introduced February 24, 2000, and as amended on July 6, 2000.  Munich Re filed
a second request for judicial notice as to the Treaty of Lausanne.  The Court GRANTS

26   Munich Re's request for judicial notice of California Senate Bill No. 1915.  As to the
Treaty of Lausanne, the Court finds it unnecessary to judicially notice this treaty, and

27   hereby DENIES Munich Re's request for judicial notice as moot.

28

1    supplemental reply.[2]  The Court heard oral argument on June 4, 2007.  After carefully

2    considering all of the parties' submissions, the Court hereby concludes as follows.

3    **II.    BACKGROUND**

4           Beginning in approximately 1880, defendant Victoria Versicherung AG

5    ("Victoria") allegedly sold life insurance policies in the Ottoman Empire.  Second

6    Amended Complaint ("SAC") ¶ 13.  Plaintiffs allege that, between 1915 and the late

7    1920s, more than one million, five hundred thousand Armenians living in the Ottoman

8    Turkish Empire were killed, deported, and displaced.  Id. ¶ 15.

9           Plaintiffs allege that defendants "failed to provide information about issued life

10   insurance policies to Armenians by Victoria, which would have assisted the

11   beneficiaries in processing their claims[,] . . . refused to honor demands[,] claiming

12   that [Victoria] was unable to provide information to identify Armenian policyholders,

13   or that the time had lapsed[, and] . . . [a]s a result, thousands of life insurance policies

14   purchased . . . remain unpaid to this date, depriving beneficiaries and heirs of their

15   rightful entitlement to the benefits of the subscribed Defendants' policies."  Id. ¶ 17.

16   Plaintiffs allege that they are "such individuals whose heirs should have received

17   benefits from their family members' life insurance policies issued by Victoria, but to

18   date remain unpaid."  Id. ¶ 18.

19          California Code of Civil Procedure § 354.4 provides:

20          (a) The following definitions govern the construction of this section:

21          (1) "Armenian Genocide victim" means any person of Armenian or other

22          ancestry living in the Ottoman Empire during the period of 1915 to 1923,

23          inclusive, who died, was deported, or escaped to avoid persecution during

24          that period.

25

26   _____

27          [2]On June 1, 2007, plaintiffs filed a request to strike Munich Re's reply because the
     Court did not grant Munich Re leave to file said reply.  In light of the Court's ruling on
28   Munich Re's motion to dismiss, the Court hereby DENIES plaintiffs' request as moot.

1   (2) "Insurer" means an insurance provider doing business in the state, or

2   whose contacts in the state satisfy the constitutional requirements for

3   jurisdiction, that sold life, property, liability, health, annuities, dowry,

4   educational, casualty, or any other insurance covering persons or property

5   to persons in Europe or Asia at any time between 1875 and 1923.

6   (b) Notwithstanding any other provision of law, any Armenian Genocide

7   victim, or heir or beneficiary of an Armenian Genocide victim, who

8   resides in this state and has a claim arising out of an insurance policy or

9   policies purchased or in effect in Europe or Asia between 1875 and 1923

10  from an insurer described in paragraph (2) of subdivision (a), may bring a

11  legal action or may continue a pending legal action to recover on that

12  claim in any court of competent jurisdiction in this state, which court

13  shall be deemed the proper forum for that action until its completion or

14  resolution.

15  (c) Any action, including any pending action brought by an Armenian

16  Genocide victim or the heir or beneficiary of an Armenian Genocide

17  victim, whether a resident or nonresident of this state, seeking benefits

18  under the insurance policies issued or in effect between 1875 and 1923

19  shall not be dismissed for failure to comply with the applicable statute of

20  limitation, provided the action is filed on or before December 31, 2010.

21  (d) The provisions of this section are severable. If any provision of this

22  section or its application is held invalid, that invalidity shall not affect

23  other provisions or applications that can be given effect without the

24  invalid provision or application.

25  California Senate Bill 1915 ("S.B. 1915"), which added section 354.4 to the

26  California Code of Civil Procedure, asserts that "California has an overwhelming

27  public policy interest in ensuring that its residents and citizens who are claiming

28  entitlement to benefits under policies issued to Armenian Genocide victims are treated

1  reasonably and fairly and that those legal obligations are honored." S.B. 1915, § 1(b).

2  To that end, the California legislature declared its "specific intent [to provide

3  Armenian Genocide-era life insurance policyholders] an expeditious, inexpensive, and

4  fair forum . . . by allowing claims to be brought in California irrespective of any

5  contrary forum selection provision contained in the policies themselves." Id. § 1(c).

6  The legislature also stated that to the extent that section 354.4 extends the limitations

7  for any contractual or tort claim, "that extension of the limitations period is intended to

8  be applied retroactively, irrespective of whether the claims were otherwise barred by

9  any applicable statute of limitations . . . ." Id. § 1(d).

10  **III.   LEGAL STANDARD**

11       A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in a

12  complaint.  A court must not dismiss a complaint for failure to state a claim "unless it

13  appears beyond doubt that the plaintiff can prove no set of facts in support of his claim

14  which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957);

15  Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 338 (9th Cir. 1996).

16       In considering a motion pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept

17  as true all material allegations in the complaint, as well as all reasonable inferences to

18  be drawn from them. Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998).  The

19  complaint must be read in the light most favorable to the nonmoving party. Sprewell

20  v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001); Parks Sch. of Bus., Inc.

21  v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995).  However, a court need not accept

22  as true unreasonable inferences or conclusory legal allegations cast in the form of

23  factual allegations. Sprewell, 266 F.3d at 988; W. Mining Council v. Watt, 643 F.2d

24  618, 624 (9th Cir. 1981).

25       Dismissal pursuant to Rule 12(b)(6) is proper only where there is either a "lack

26  of a cognizable legal theory or the absence of sufficient facts alleged under a

27  cognizable legal theory." Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th

28  Cir. 1990).

1    Furthermore, unless a court converts a Rule 12(b)(6) motion into a motion for

2    summary judgment, a court cannot consider material outside of the complaint (e.g.,

3    facts presented in briefs, affidavits, or discovery materials).  In re American Cont'l

4    Corp./Lincoln Sav. & Loan Sec. Litig., 102 F.3d 1524, 1537 (9th Cir. 1996), rev'd on

5    other grounds sub nom Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523

6    U.S. 26 (1998). A court may, however, consider exhibits submitted with or alleged in

7    the complaint and matters that may be judicially noticed pursuant to Federal Rule of

8    Evidence 201.  In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir.

9    1999); Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001).

10    For all of these reasons, it is only under extraordinary circumstances that

11    dismissal is proper under Rule 12(b)(6).  United States v. City of Redwood City, 640

12    F.2d 963, 966 (9th Cir. 1981).

13    As a general rule, leave to amend a complaint which has been dismissed should

14    be freely granted. Fed. R. Civ. P. 15(a).  However, leave to amend may be denied

15    when "the court determines that the allegation of other facts consistent with the

16    challenged pleading could not possibly cure the deficiency."  Schreiber Distrib. Co. v.

17    Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986); see Lopez v. Smith,

18    203 F.3d 1122, 1127 (9th Cir. 2000).

19    **IV.    DISCUSSION**

20    **A. Plaintiffs' Standing Under § 354.4**

21    In their second amended complaint, plaintiffs allege that they are "heirs of

22    beneficiaries" to life insurance policies issued to "Armenian Genocide victims."  SAC

23    ¶¶ 4-7.[3]  Munich Re argues that section 354.4 grants standing to "Armenian Genocide

24    victims," their heirs, and their beneficiaries, but not the "heirs of beneficiaries."

25    Munich Re argues that "beneficiary" typically means the person named in a life

26    _____

27    [3]In light of the controversy surrounding the subject, the Court uses quotation marks
      when referring to the events described by the California legislature as the "Armenian
28    Genocide."

1    insurance policy to be paid the proceeds upon the death of the insured. Munich Re

2    also contends that the definition of "heir" under the California Probate Code should

3    apply here. In the Probate Code, "heir" is defined as "any person . . . who is entitled to

4    take property of the decedent by intestate succession under this code." Probate Code §

5    44. Further, Probate Code § 240 requires that an "heir" be alive at the time of the

6    death of the decedent in order to take by intestate succession.

7         Munich Re argues that, to the extent that the Court might interpret the statute to

8    encompass "heirs of beneficiaries" as well as heirs or beneficiaries of "Armenian

9    Genocide victims," such an interpretation would be inconsistent with Cal. Code Civ.

10   P. § 1858. Munich Re's Supp'l Brief at 19 (citing People v. Guzman, 35 Cal. 4th 577,

11   587 (2005); Security Pacific Nat'l Bank v. Wozab, 51 Cal. 3d 991, 998 (1990)). Cal.

12   Code Civ. P. § 1858 states that "[i]n the construction of a statute or instrument, the

13   office of the Judge is simply to ascertain and declare what is in terms or in substance

14   contained therein, not to insert what has been omitted, or to omit what has been

15   inserted."

16        Plaintiffs argue that, should Munich Re's interpretation of the statute be

17   accepted, virtually no "heirs" or "beneficiaries" will be able to bring suit because they

18   are no longer alive. If an "heir" must have been alive at the time of the death of the

19   "Armenian Genocide victim," few such heirs would still be alive today, over 80 years

20   since the events covered by the statute. Likewise, few named beneficiaries to the

21   insurance policies at issue would be alive today, considering the fact that the policies

22   were issued between 1875 and 1923.

23        The Court finds Munich Re's reading of the statute to be overly narrow. It

24   appears to the Court that the intent of the California legislature was that section 354.4

25   allow all heirs, including both heirs of "Armenian Genocide victims" and heirs of

26   insurance policy beneficiaries, to pursue claims. Further, interpreting section 354.4 to

27   apply to heirs of beneficiaries does not impermissibly add new language to the statute

28   in violation of Cal. Code Civ. P. § 1858. In Guzman, the primary case upon which

S:\CAS\Orders\CIVIL\2003\03-9407.dismiss.MunichRe.numbered.wpd                                    7

Munich Re relies, the California Supreme Court declined to add new, inconsistent language to an unambiguous statute that would dramatically increase the scope of the statute. Here, in contrast, the language of section 354.4 is not unambiguous, in that an overly literal reading of the statute would abrogate the legislature's stated intent to "ensur[e] that its residents and citizens who are claiming entitlement to benefits under policies issued to "Armenian Genocide victims" are treated reasonably and fairly and that those legal obligations are honored" because few if any heirs or beneficiaries of "Armenian Genocide victims" are likely alive.

Even if section 354.4(b) were strictly interpreted to grant standing only to Armenian Genocide victims, their heirs or beneficiaries, plaintiffs do not bring a claim for relief arising under that section. Rather, plaintiffs rely solely upon section 354.4(c), which extends the statute of limitations.[4] Section 354.4(c) applies to "[a]ny action, *including* any pending action brought by an Armenian Genocide victim or the heir or beneficiary of an Armenian Genocide victim whether a resident or nonresident of this state, seeking benefits under the insurance policies issued or in effect between 1875 and 1923" (emphasis added). Thus, the literal language of section 354.4(c) suggests that the section applies more broadly than section 354.4(b).

Finally, Munich Re argues that, because plaintiffs assert claims on behalf of beneficiaries as successors in interest, plaintiffs must file an affidavit to that effect pursuant to Cal. Code. Civ. Pro § 377.32. Whether plaintiffs need to, and in fact have, filed such an affidavit is more properly considered on a motion for summary judgment.

For these reasons, the Court concludes that plaintiffs have standing to pursue their claims.

**B. Whether Munich Re is a Proper Defendant**

Plaintiffs allege that Munich Re is "acting in association with Victoria and Ergo and/or is a successor in interest to policies issued by Victoria prior to 1915 in the

---

[4]As discussed below, section 354.4(d) provides that each of the subsections in the statute are severable, and therefore the Court may consider section 354.4(c) separately.

1   Ottoman Turkish Empire." SAC ¶ 10.  Munich Re argues that because it did not

2   directly issue the insurance policies to Armenian Genocide victims, it is not an

3   "insurer" within the meaning of section 354.4 and is therefore not a proper defendant

4   in this action.  Munich Re points out that, unlike sections 354.5 and 354.6 of the

5   California Code of Civil Procedure, section 354.4 does not provide for liability of

6   "related companies."  Munich Re also contends that plaintiffs' assertion that Munich

7   Re is a "successor in interest" is a legal conclusion that the Court need not accept as

8   true.

9        Sections 354.5 and 354.6,[5] like section 354.4, provide extensions of the statute

10  of limitations for certain claims.  Sections 354.5(b) provides that a Holocaust victim

11  who has a claim arising under an insurance policy claim purchased in Europe before

12  1945 from an insurer may bring a legal action to recover on that claim.  The statute

13  defines "insurer" as an insurance provider that sold insurance covering persons or

14  property in Europe before 1945, directly or through a related company, "whether the

15  sale of the insurance occurred before or after the insurer and the related company

16  became related."  Cal. Code Civ. Pro. § 354.5(a)(3).  "Related company" is defined as

17  "any parent, subsidiary, reinsurer, successor in interest, managing general agent, or

18  affiliate company of the insurer."  Id. § 354.5(a)(2).  Section 354.6 provides that any

19  "Second World War slave labor victim" may bring an action to recover compensation

20  from "any entity or successor in interest thereof, for whom that labor was performed,

21  either directly or through a subsidiary or affiliate."  Id. § 354.6(b).  Indeed, it appears

22  that the California legislature originally included such "related company" language in

23  a draft of section 354.4, which was later removed.  See S.B. 1915, as amended in

24  Assembly on July 6, 2000.  According to Munich Re, this difference in language must

25

26

27        [5]As discussed below, both statutes have been held unconstitutional based upon the

28  foreign affairs doctrine.

1  be given effect, such that plaintiffs may not bring suit against a successor in interest of

2  an insurer.

3       Plaintiffs argue that Munich Re can be liable as a successor.  Plaintiffs rely upon

4  California Corporations Code § 1107(a), which states that a successor company

5  assumes "the debts and liabilities [of the merged corporation] . . . as if the surviving

6  corporation had itself incurred them," and upon the "de facto" merger doctrine.  Opp'n

7  at 6 (citing Marks v. Minnesota Mining & Mfg. Co., 187 Cal. App. 3d 1429, 1435

8  (1986)).  Plaintiffs contend that the legislature's deletion of the "related companies"

9  language in section 354.4 does not narrow the claims covered by the statute.  Plaintiffs

10 argue that, under the prior version of section 354.4, "insurer" was defined as an

11 insurance provider who sold insurance policies "directly or though a related

12 company."  However, under the operative version of section 354.4, the definition of

13 "insurer" does not include this language.  Plaintiffs argue that section 354.4, therefore,

14 does not necessarily limit the scope of defendants under the statute to those who sold

15 the insurance directly.

16      It appears to the Court that section 354.4(c) does not necessarily limit the scope

17 of defendants against whom a claim may be brought.  While section 354.4 defines the

18 term "insurer," it does not state that section 354.4(c) applies only against the direct

19 issuer of the insurance policy.  Nowhere in the statute does it say actions for insurance

20 benefits may be brought solely against the "insurer."  Nor did the previous version of

21 section 354.4, which included the "related companies" language, have such a

22 requirement.  More importantly, even if section 354.4(b) could be said to limit relief

23 under that provision to actions against the direct issuer of the insurance policy, section

24 354.4(c) is defined more broadly.  In this way, section 354.5, which includes the

25 "related company" provision, is distinguishable from section 354.4.  Section 354.5(c)

26 extends the statute of limitations for "[a]ny action brought by a Holocaust victim or

27 the heir or beneficiary of a Holocaust victim, whether a resident or nonresident of this

28

1    state, seeking proceeds of the insurance policies issued or in effect before 1945." <u>See</u>

2    Cal. Code Civ. P. 354.5(c). Section 354.4(c) is written more broadly, applying to "any

3    action, including" an action brought by an Armenian Genocide victim, heir, or

4    beneficiary. By Munich Re's own reasoning, this difference in language should be

5    given effect.

6         Finally, whether Munich Re is a "successor in interest" to the insurance policies

7    at issue should be determined on a motion for summary judgment, rather than a motion

8    to dismiss.

9    **C. Whether § 354.4(c) Violates Munich Re's Due Process Rights**

10        Munich Re argues that section 354.4 "purports to regulate transactions that took

11   place in Europe and Turkey many decades ago between a German company and

12   Armenian residents of Turkey," which Munich Re contends a state may not do under

13   the Due Process Clause of the Fourteenth Amendment. Mot. at 9.

14        A number of cases have held that a state cannot apply its substantive law to a

15   controversy consistently with the Due Process Clause unless the state has "a

16   significant contact or significant aggregation of contacts, creating state interests, such

17   that choice of its law is neither arbitrary nor fundamentally unfair." <u>Allstate Ins. Co.</u>

18   <u>v. Hague</u>, 449 U.S. 302, 313 (1981); <u>see also</u> <u>John Hancock Mut. Life Ins. Co. v.</u>

19   <u>Yates</u>, 299 U.S. 178, 182 (1936) (Georgia court's attempt to apply Georgia law to an

20   insurance policy which incorporated New York law as "a term of the contract" was

21   invalid where the controversy's only contact with Georgia was plaintiff's post-

22   occurrence change of residence); <u>Home Ins. Co. v. Dick</u>, 281 U.S. 397 (1930) (state

23   court's attempt to apply Texas statute of limitations to an insurance contract "issued in

24   Mexico, by Mexican insurer, to a Mexican citizen [although assigned to a nominal

25   Texas resident] covering a Mexican risk" violated Contracts Clause, Due Process

26   Clause, and equal protection).

27

28

S:\CAS\Orders\CIVIL\2003\03-9407.dismiss.MunichRe.numbered.wpd                                    11

1      Plaintiffs argue that section 354.4 is not a substantive law, but rather a

2 procedural one governing venue and the statute of limitations. A legislature's decision

3 to provide venue, or a court's decision that venue is appropriate, does not implicate the

4 Due Process Clause, at least where personal jurisdiction is present. The traditional

5 approach to venue is that it can lie wherever there is personal jurisdiction, even if the

6 forum is inappropriate or inconvenient. See RESTATEMENT (SECOND) OF CONFLICT

7 OF LAWS § 84 cmt. g (1971) ("The doctrine of inconvenient forum is not

8 jurisdictional. If a state chooses to exercise such judicial jurisdiction as it possesses,

9 despite the fact that it is an inappropriate forum, its action in this regard is valid and

10 will be entitled to full faith and credit in the other states."). This traditional approach

11 was followed by the Supreme Court in Sun Oil v. Wortman, 486 U.S. 717 (1988). Sun

12 Oil upheld a Kansas court's application of Kansas' statute of limitations to claims

13 which had been found, pursuant to Hague, to have so little connection to the forum

14 that it would be constitutionally impermissible to apply the forum's law to them. The

15 Court characterized the Kansas statute of limitations as a procedural rule for the

16 purposes of the conflict of laws analysis[6] and noted that "since the procedural rules of

17 its courts are surely matters on which a State is competent to legislate, it follows that a

18 State may apply its own procedural rules to actions litigated in its own courts." Sun

19 Oil, 486 U.S. at 722. The Court added that "a State's interest in regulating the work

20 load of its courts and determining when a claim is too stale to be adjudicated certainly

21

22      [6] The characterization of the statute of limitations as a procedural rule arose in
response to defendant's argument in Sun Oil that statutes of limitations are substantive

23 under Erie. The Court rejected the notion that "there is an equivalence between what is
substantive under the Erie doctrine and what is substantive for purposes of conflict of

24 laws." Sun Oil, 486 U.S. at 726 (citing Guaranty Trust Co. v. York, 326 U.S. 99, 108

25 (1945)). The Court explained that the line between substance and procedure is dependent
on the purpose for which the distinction is drawn, and noted that the purpose of Erie, "to

26 establish . . . substantial uniformity of predictable outcome between cases tried in a federal

27 court and [a state court]," is very different from the purpose of conflict of laws, "to delimit

28 spheres of state legislative competence." Id.

1    suffices to give it legislative jurisdiction to control the remedies available in its courts

2    by imposing statutes of limitations." Id. at 730.

3            In Marootian v. New York Life Insurance Company, No. CV-99-12073, 2001

4    U.S. Dist. LEXIS 22274 (C.D. Cal. Nov. 28, 2001), this Court noted that

5            [t]he principle underlying the Sun Oil decision also applies to section

6            354.4.  Section 354.4 does not provide any rule of decision determining

7            plaintiffs' claims, nor does it mandate the application of any particular

8            substantive law to those claims; it simply attempts to provide a forum in

9            California to allow those claims to be heard.  Here, as in Sun Oil, the

10           California legislature is competent to assess the work load of California

11           courts and decide that public policy mandates a consideration of

12           plaintiffs' claims, in spite of burdens it may place on those courts.  As in

13           Sun Oil, this decision does not violate the Due Process Clause.

14   Id. at *49.

15           Munich Re argues that the Ninth Circuit's subsequent decision in Deutsch v.

16   Turner Corp., 324 F.3d 692 (9th Cir. 2003), dictates a contrary result.  In Deutsch, the

17   Ninth Circuit considered the constitutionality of section 354.6 of the California Code

18   of Civil Procedure, which provides that "[a]ny Second World War slave labor victim,

19   or heir of a Second World War slave labor victim, Second World War forced labor

20   victim, or heir of a Second World War forced labor victim, may bring an action to

21   recover compensation for labor performed as a Second World War slave labor victim

22   or Second World War forced labor victim from any entity or successor in interest

23   thereof, for whom that labor was performed, either directly or through a subsidiary or

24   affiliate." Cal. Code. Civ. Pro. § 354.6(b).  Further, "[a]ny action brought under this

25   section shall not be dismissed for failure to comply with the applicable statute of

26   limitation, if the action is commenced on or before December 31, 2010." Id. §

27   354.6(c).

28

In <u>Deutsch</u>, the parties debated whether section 354.6 was substantive or procedural primarily in the context of the defendants' due process challenge, which the Ninth Circuit did not address.  However, the court found the question relevant to its foreign affairs doctrine analysis.  <u>Deutsch</u>, 324 F.3d at 708.  The court noted that, when viewing subsection (c) in isolation, section 354.6 appeared to be a purely procedural statute.  However, the other provisions of section 354.6 suggested that the statute creates a substantive cause of action.  The court noted that "the first sentence of subsection (b) explicitly creates a cause of action by providing that certain individuals 'may bring an action' for certain wrongs."  <u>Id.</u> at 707.  Section 354.6 also defined the class of plaintiffs who may sue under the statute, set the method for measuring damages, and established "a special rule regarding liability of corporations affiliated with the wrong-doer."  <u>Id.</u>  Further, the statute of limitations provision "limits the application of the statute of limitations to 'action[s] brought under this section,' thus confirming that section 354.6 creates a cause of action."  <u>Id.</u>

The <u>Deutsch</u> court stated that "section 354.6 creates a special rule that applies only to a newly defined class of tort actions--actions brought by Second World War slave labor victims against the entities that enslaved them.  This new rule profoundly alters the likelihood that such actions will succeed, by not only extending the statute of limitations for claims that were timely when the statute took effect (although we doubt that any such claims existed), but, far more important, by reviving claims that were already time-barred."  <u>Id.</u> at 708.  Although the court did not address the defendants' argument that section 354.6 violates due process, the court noted that "[s]uch a revival of liability--even civil liability--is troubling and raises serious due process questions."  <u>Id.</u>

In <u>Cruz v. United States</u>, 387 F. Supp. 2d 1057 (N.D. Cal. 2005), the Northern District of California considered the constitutionality of another California statute,

Cal. Code. Civ. Pro. § 354.7(c).[7]  In deciding that particular provision's constitutionality, the court noted that it need only consider subsection (c), and did not consider whether other parts of the statute would survive a constitutional challenge. The court distinguished <u>Deutsch</u> on the ground that, unlike section 354.6, section 354.7 made each provision severable on its face.  Likewise, section 354.4(d) provides that "[t]he provisions of this section are severable.  If any provision of this section or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application." Plaintiffs do not allege a claim under section 354.4(b); rather, plaintiffs bring claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and constructive trust.  Only the extension of the applicable statute of limitations in subsection (c) has any application in this case.[8]  Thus, this Court need only consider whether section 354.4(c), the statute of limitations provision, is procedural or substantive, notwithstanding language in subsection (b) that could

---

[7]Section 354.7(b) provides that the heirs or beneficiaries of a bracero "who has a claim arising out of a failure to pay or turn over savings fund amounts may bring a legal action or may continue a pending legal action to recover on that claim in any court of competent jurisdiction in this state."  Subsection (c) provides that, "[n]otwithstanding any other provision of law, any action brought by a bracero, or heir or beneficiary of a bracero, arising out of a failure to pay or turn over savings fund amounts shall not be dismissed for failure to comply with the otherwise applicable statute of limitations, provided the action is filed on or before December 31, 2005."

[8]The court in <u>Deutsch</u> noted that "section 354.6 can be viewed as purely procedural only when subsection (c)[, which extends the applicable statute of limitations,] is viewed in isolation from the rest of the provision." 324 F.3d at 707.  In <u>Deutsch</u>, subsection (c) could not be viewed in isolation in part because subsection (c) extended the statute of limitations only for "action[s] brought under this section," which confirmed that section 354.6 creates a cause of action.  In contrast, section 354.4(c) applies to "[a]ny action, including [an action described in subsection (b),] seeking benefits under the insurance policies issued or in effect between 1875 and 1923."  This difference in language lends further support to the Court's conclusion that section 354.4(c) may be viewed in isolation.

1    arguably create a substantive cause of action.  Viewing subsection (c) alone, the

2    provision is procedural in nature pursuant to <u>Sun Oil</u>.[9]

3          Munich Re next argues that "[a]pplying a new statute of limitations . . . to revive

4    previously expired common law claims . . . is substantive, not procedural."  Munich

5    Re's Supp'l Brief at 15.  Munich Re bases this argument on the Ninth Circuit's

6    holding in <u>Chenault v. U.S. Postal Service</u>, 37 F.3d 535 (9th Cir. 1994).  In <u>Chenault</u>,

7    the plaintiff's employment discrimination case was pending when Congress enacted

8    the Civil Rights Act of 1991, which, among other things, extended the filing period in

9    employment discrimination cases against the government from 30 days to 90 days.

10   Although the plaintiff failed to exhaust his administrative remedies within 30 days

11   prior to Congress's extension of the filing period, the plaintiff sought to apply the

12   new, 90 day limitations period to his claim.  The plaintiff argued that the new statute

13   could be applied retroactively because a statute of limitations provision is procedural,

14

15         [9]The Court is also unpersuaded that the reasoning of the Supreme Court in <u>Home
     Ins. Co. v. Dick</u>, 281 U.S. 397 (1930), governs the instant case.  At issue in <u>Dick</u> was a

16   Texas statute that forbade any company from entering into any contract "by reason

17   whereof the time in which to sue thereon is limited to a shorter period than two years," and
     barred any "stipulation, contract, or agreement for any such shorter limitation in which to

18   sue[.]"  <u>Id.</u> at 404-405.  The plaintiff brought suit against the defendant Mexican

19   corporation to recover insurance benefits under a policy issued and paid for in Mexico.
     The insurance policy included a provision for a one-year statute of limitations for claims

20   arising from the policy.  The Court held that due process barred the application of the

21   Texas statute to the Mexican insurance policy because "in the case at bar, nothing in any
     way relating to the policy sued on, or to the contracts of reinsurance, was ever done or

22   required to be done in Texas," and "Texas was therefore without power to affect the terms

23   of contracts so made."  <u>Id.</u> at 407-408.  As the Court explained, "the Texas statute deals
     neither with the kind of remedy available nor with the mode in which it is to be pursued.

24   It purports to create rights and obligations.  It may not validly affect contracts which are

25   neither made nor are to be performed in Texas."  <u>Id.</u> at 410.  The instant case is
     distinguishable.  Section 354.4(c) does not in any way affect the terms of the insurance

26   policies at issue in this case, does not create rights and obligations, and does not attempt

27   to apply substantive California law.  Rather, under <u>Sun Oil</u>, section 354.4(c) is procedural.
     As the Court has made clear, section 354.4(b), which might be said to create a cause of

28   action, is not at issue in the instant case.

1  rather than substantive.  Rejecting this argument, the court reasoned that "[w]e do not

2  find the substantive/procedural dichotomy helpful in deciding this case.  Regardless of

3  whether a statute is 'substantive' or 'procedural,' it may not apply to cases pending at

4  the time of enactment if the new statute would prejudice the rights of one of the

5  parties."  Id. at 539.  The court held that "a newly enacted statute that lengthens the

6  applicable statute of limitations may not be applied retroactively to revive a plaintiff's

7  claim that was otherwise barred under the old statutory scheme because to do so would

8  alter the substantive rights of a party and increase a party's liability."  Id. at 539

9  (internal quotation marks omitted).

10      Munich Re argues that plaintiffs' claims were already time-barred before the

11  California legislature passed section 354.4 in 2000.  Thus, according to Munich Re,

12  section 354.4(c) may not be applied retroactively to revive plaintiffs' expired claims.

13  However, Munich Re takes quotations from Chenault out of context.  Chenault does

14  not rely upon principles of due process in reaching its conclusion.  Rather, the court

15  based its holding upon the principle that, if Congress is silent on whether or not a

16  statute applies retroactively, the court should examine the statute in accordance with

17  Landgraf v. USI Film Prods., 511 U.S. 244 (1994).  In Landgraf, the Supreme Court

18  noted that "[s]ince the early days of this Court, we have declined to give retroactive

19  effect to statutes burdening private rights unless Congress had made clear its intent. . .

20  . The presumption against statutory retroactivity has consistently been explained by

21  reference to the unfairness of imposing new burdens on persons after the fact."  See id.

22  at 270.

23      On the other hand, where the legislature makes clear its intention that a statute

24  apply retroactively, the Constitution places few bars on that power.  In Chase

25  Securities Corp. v. Donaldson, 325 U.S. 304 (1945), the Supreme Court rejected the

26  contention that due process bars a state legislature from retroactively extending a

27  statute of limitations, thereby reviving an expired claim.  The Court stated that

28

S:\CAS\Orders\CIVIL\2003\03-9407.dismiss.MunichRe.numbered.wpd                    17

1          [t]he Fourteenth Amendment does not make an act of state legislation

2          void merely because it has some retrospective operation. What it does

3          forbid is taking of life, liberty or property without due process of law.

4          Some rules of law probably could not be changed retroactively without

5          hardship and oppression, and this whether wise or unwise in their origin.

6          Assuming that statutes of limitation like other types of legislation could

7          be so manipulated that their retroactive effects would offend the

8          Constitution, certainly it cannot be said that lifting the bar of a statute of

9          limitation so as to restore a remedy lost through mere lapse of time is per

10          se an offense against the Fourteenth Amendment.

11   Id. at 315-16.  This principle has been widely recognized by numerous courts,

12   including the Ninth Circuit.  See, e.g., Underwood Cotton Co., Inc. v. Hyundai

13   Merchant Marine (American), Inc., 288 F.3d 405, 409 n.7 (9th Cir. 2002) ("It is also

14   true that the legislature can remove a statute of limitations impediment

15   retroactively."); Shadburne-Vinton v. Dalkon Shield Claimants Trust, 60 F.3d 1071,

16   1078 (4th Cir. 1995) ("It is undisputed that a legislature may in certain instances

17   retroactively enlarge a statute of limitations without violating the Constitution.");

18   Johnston v. Cigna Corp., 14 F.3d 486, 493 (10th Cir. 1993) ("We agree that Congress

19   has the power to change limitations periods, and as a result, a party cannot claim a

20   vested right to a prior limitations period."); Perez v. Richard Roe 1, 146 Cal. App. 4th

21   171, 182 n.6 (2006) ("As appellants and amicus point out, the Legislature is free to

22   retroactively increase a civil statute of limitations.").

23          Thus, Munich Re's argument is not supported by established caselaw.  The

24   California legislature has expressed its intention that section 354.4(c) operate

25   retroactively, which the legislature is free to do.  Further, whether or not Chenault

26   characterized the extension of a statute of limitations as procedural or substantive for

27   purposes of analysis under Landgraf, where the legislature is silent on the issue of

28   retroactivity, is irrelevant to whether such an extension is substantive for purposes of

1   conflict of laws analysis.  As the Supreme Court has stated, "the meaning of

2   'substance' and 'procedure' in a particular context is largely determined by the

3   purposes for which the dichotomy is drawn."  Jinks v. Richland County, S.C., 538

4   U.S. 456, 465 (2003).  The purpose of the "substance-procedure dichotomy" in the

5   context of conflict of laws analysis is "to delimit spheres of state legislative

6   competence."  Sun Oil, 486 U.S. at 727.  In contrast, the reasoning of Chenault has

7   little to do with legislative competence; rather, that case applies where the legislature

8   is otherwise silent on the issue of retroactivity.  The Supreme Court held in Sun Oil

9   that statutes of limitations are procedural for purposes of conflict of laws analysis,[10]

10  and Chenault does not suggest that a different rule is warranted in this case.

11              **D. Whether § 354.4 is Preempted Under the Foreign Affairs Doctrine**

12          Munich Re argues that section 354.4 infringes the foreign affairs power granted

13  to the federal government because the statute (1) interferes with the executive's

14  chosen method of resolving World War I claims against German nationals; (2)

15  undermines the United States' diplomatic relations with Turkey and Armenia; and (3)

16  improperly creates a judicial forum for attacks upon Turkey.

17          Munich Re asserts that the Ninth Circuit's opinion in Deutsch, and the Supreme

18  Court's opinion American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003), warrant a

19  finding that section 354.4 is preempted by federal foreign policy.  In Deutsch, the

20  Ninth Circuit held Cal. Code Civ. P. § 354.6 invalid pursuant to the foreign affairs

21  doctrine.  Section 354.6 created a cause of action against German and Japanese

22  corporations for claims involving Second World War slave labor.  The statute also

23  extended the statute of limitations for such actions.  The Deutsch court noted that

24

25

26          [10]Choice of law analysis between two states is generally the same as the analysis

27  between the law of a state and a foreign country.  See Restatement (Second) of Conflict

28  of Laws § 10 (1971).  Thus, the holding of Sun Oil cannot be limited to the fact that it
    dealt with conflict between the laws of two states, rather than a state and a foreign county.

> [b]ecause the Constitution mentions no general foreign affairs power, and
> because only a few specified powers related to foreign affairs are
> expressly denied the states, one might assume that, with certain
> exceptions, states are free to pursue their own foreign policies. This is
> not, however, the case. To the contrary, the Supreme Court has long
> viewed the foreign affairs powers specified in the text of the Constitution
> as reflections of a generally applicable constitutional principle that power
> over foreign affairs is reserved to the federal government.

324 F.3d at 709.  The court further noted that "[t]he implication of the general
principle is that even in the absence of a treaty or federal statute, a state may violate
the constitution by establishing its own foreign policy." Id. (quoting Zschernig v.
Miller, 389 U.S. 429, 441 (1968)) (internal quotation marks and brackets omitted).  In
light of the federal government's exclusive power over foreign affairs, the court
determined that "[i]n the absence of some specific action that constitutes authorization
on the part of the federal government, states are prohibited from exercising foreign
affairs powers, including modifying the federal government's resolution of war-related
disputes." Id. at 714.

The court in Deutsch found that "the United States has already exercised its own
exclusive authority to resolve [World War II], including claims arising out of it.  It did
not choose, however, to incorporate into that resolution a private right of action
against our wartime enemies or their nationals." Id. at 712.  The court concluded that
California

> was dissatisfied with how the federal government chose to address the
> various wartime injuries suffered by victims of the Nazis and their allies
> after the United States brought the Second World War to a close. The
> California legislature found that, under the treaties and compensatory
> programs that the federal government had established, "victims of Nazi
> persecution have been deprived of their entitlement to compensation for

1      their labor and for injuries sustained while performing that labor as forced

2      or slave laborers prior to and during the Second World War." 1999 Cal.

3      Stat. 216, § 1(b) (codified in notes to Cal. Code Civ. Proc. § 354.6). The

4      state legislature therefore enacted section 354.6 to remedy these

5      54-year-old injuries in a manner favored by California but not provided

6      for by the federal government. Appellants assert that no international

7      agreement or other federal action prohibits California from doing so.

8      However, as we have stated, because the issue is the lack of state power,

9      it is immaterial whether the federal government enacted a prohibition.

10      The federal government, acting under its foreign affairs authority,

11      provided its own resolution to the war; California has no power to modify

12      that resolution.

13 Id. at 715.[11]

14      In Garamendi, the Supreme Court considered the constitutionality of the

15 California Holocaust Victim Insurance Relief Act of 1999 ("HVIRA"), Cal. Ins. Code

16 Ann. § 13804(a).  The Act requires "any insurer currently doing business in the state"

17 to disclose the details of "life, property, liability, health, annuities, dowry, educational,

18 or casualty insurance policies" issued "to persons in Europe, which were in effect

19 between 1920 and 1945." Cal. Ins. Code Ann. § 13804(a).

20      In considering the argument that the federal foreign affairs power preempts

21 HVIRA, the Court first noted that "[t]here is, of course, no question that at some point

22 an exercise of state power that touches on foreign relations must yield to the National

23 Government's policy, given the 'concern for uniformity in this country's dealings with

24 foreign nations' that animated the Constitution's allocation of the foreign relations

25

26      [11]The California Court of Appeal has also held that section 354.6 is preempted by

27 the federal government's foreign policy that claims against Japan and its nationals are to

28 be resolved diplomatically. See Taiheiyo Cement Corp. v. Superior Court, 117 Cal. App. 4th 380 (2004).

1  power to the National Government in the first place." <u>Garamendi</u>, 539 U.S. at 413

2  (quoting <u>Banco Nacional de Cuba v. Sabbatino</u>, 376 U.S. 398, 427, n. 25 (1964)).

3      The <u>Garamendi</u> Court turned to its decision in <u>Zschernig</u>. <u>Zschernig</u> involved

4  an Oregon statute which provided that a nonresident alien's probate claims to the

5  property of Oregon decedents would escheat to the state unless three conditions were

6  fulfilled: (1) the existence of a reciprocal right of a United States citizen to take

7  property on the same terms as a citizen or inhabitant of the foreign country; (2) the

8  right of United States citizens to receive payment here of funds from estates in the

9  foreign country; and (3) the right of the foreign heirs to receive the proceeds of

10 Oregon estates "without confiscation." <u>Zschernig</u>, 389 U.S. at 430.  The Court noted

11 that courts in Oregon, and other states that had passed similar statutes, had engaged in

12 broad and inappropriate criticisms of the governments of authoritarian countries in the

13 course of evaluating whether those countries made probate property available on "the

14 same terms" as the United States and "without confiscation." <u>Id.</u> at 435 ("[W]e find

15 that [the court decisions] radiate some of the attitudes of the 'cold war,' where the

16 search is for the 'democracy quotient' of a foreign regime").[12]  The Court found that

17 such evaluations "affect international relations in a persistent and subtle way," and

18 thus "may well adversely affect the power of the central government to deal with"

19 _____

20      [12] The Court noted its disapproval of the following statements, among others, from

21 state court probate decisions refusing to release property to nonresident aliens: (1) "[W]e
   are entitled to take into consideration the fact that declarations of government officials in

22 communist-controlled countries as to the state of affairs existing within their borders do
   not always comport with the actual facts."; (2) "If this money were turned over to the

23 Russian authorities, it would be used to kill our boys and innocent people in Southeast

24 Asia."; (3) "All the known facts of a Sovietized state lead to the irresistible conclusion that

25 sending American money to a person within the borders of an Iron Curtain country is like
   sending a basket of food to Little Red Ridinghood in care of her 'grandmother' . . . .

26 [T]here is no assurance upon which an American court can depend that a named

27 Yugoslavian individual beneficiary of American dollars will have anything left to shelter,
   clothe, and feed himself once he has paid financial involuntary tribute to the tyranny of a

28 totalitarian regime." 389 U.S. at 436, 437 n.8.

1   problems of international relations. Id. at 440-41. The Court then held that the

2   Oregon statute was unconstitutional as applied because it was "an intrusion by

3   [Oregon] into the field of foreign affairs which the Constitution entrusts to the

4   President and Congress," id. at 432, because it had "more than 'some incidental or

5   indirect effect in foreign countries,'" id. at 434 (quoting Clark v. Allen, 331 U.S. 503,

6   516-17 (1947)), and because it had a "great potential for disruption or

7   embarrassment." Id. at 435.

8         The Court in Garamendi noted the dissenting opinion of Justice Harlan in

9   Zschernig, who argued that the majority's

10        implication of preemption of the entire field of foreign affairs was at odds

11        with some other cases suggesting that in the absence of positive federal

12        action "the States may legislate in areas of their traditional competence

13        even though their statutes may have an incidental effect on foreign

14        relations." 389 US, at 459, 19 L Ed 2d 683, 88 S Ct 664 (opinion

15        concurring in result) (citing cases); see id., at 462, 19 L Ed 2d 683, 88 S

16        Ct 664 (White, J., dissenting). Thus, for Justice Harlan it was crucial that

17        the challenge to the Oregon statute presented no evidence of a "specific

18        interest of the Federal Government which might be interfered with" by

19        the law. Id., at 459, 19 L Ed 2d 683, 88 S Ct 664 (opinion concurring in

20        result); see id., at 461, 19 L Ed 2d 683, 88 S Ct 664 (finding "no evidence

21        of adverse effect in the record"). He would, however, have found

22        preemption in a case of "conflicting federal policy," see id., at 458-459,

23        19 L Ed 2d 683, 88 S Ct 664, and on this point the majority and Justices

24        Harlan and White basically agreed: state laws "must give way if they

25        impair the effective exercise of the Nation's foreign policy," id., at 440[.] .

26        . . It is a fair question whether respect for the executive foreign relations

27        power requires a categorical choice between the contrasting theories of

28        field and conflict preemption evident in the Zschernig opinions, but the

1     question requires  no answer here. For even on Justice Harlan's view, the

2     likelihood that state legislation will produce something more than

3     incidental effect in conflict with express foreign policy of the National

4     Government would require preemption of the state law. And since on his

5     view it is legislation within "areas of . . . traditional competence" that

6     gives a State any claim to prevail, 389 US, at 459, 19 L Ed 2d 683, 88 S

7     Ct 664, it would be reasonable to consider the strength of the state

8     interest, judged by standards of traditional practice, when deciding how

9     serious a conflict must be shown before declaring the state law

10     preempted.

11  Garamendi, 539 U.S. at 418-20 (footnotes omitted).

12       In footnote 11, the Court elaborated further on the relationship between field

13  and conflict preemption.  The Court noted that

14     [t]he two positions can be seen as complementary. If a State were simply

15     to take a position on a matter of foreign policy with no serious claim to be

16     addressing a traditional state responsibility, field preemption might be the

17     appropriate doctrine, whether the National Government had acted and, if

18     it had, without reference to the degree of any conflict, the principle

19     having been established that the Constitution entrusts foreign policy

20     exclusively to the National Government. . . .  Where, however, a State has

21     acted within what Justice Harlan called its "traditional competence," 389

22     US, at 459, 19 L Ed 2d 683, 88 S Ct 664, but in a way that affects foreign

23     relations, it might make good sense to require a conflict, of a clarity or

24     substantiality that would vary with the strength or the traditional

25     importance of the state concern asserted. Whether the strength of the

26     federal foreign policy interest should itself be weighed is, of course, a

27     further question.

28  Id. at 419 n.11.

1   The Court found it unnecessary to resolve these issues, however, because it
2   found a clear conflict between the policies adopted by the federal government and
3   California. Id. at 421. The President had chosen to "encourage European
4   governments and companies to volunteer settlement funds in preference to litigation or
5   coercive sanctions." Id. President Clinton had signed the German Foundation
6   Agreement in July 2000, in which Germany agreed to create a voluntary compensation
7   fund to resolve claims against German companies. Id. at 408. The United States
8   signed similar agreements with Austria and France. Id. In contrast, California had
9   "taken a different tack of providing regulatory sanctions to compel disclosure and
10  payment, supplemented by a new cause of action for Holocaust survivors if the other
11  sanctions should fail." Id. at 423. "Whereas the President's authority to provide for
12  settling claims in winding up international hostilities requires flexibility in wielding
13  'the coercive power of the national economy' as a tool of diplomacy . . . HVIRA
14  denies this, by making exclusion from a large sector of the American insurance market
15  the automatic sanction for noncompliance with the State's own policies on disclosure."
16  Id. at 424. The Court concluded that "[t]he basic fact is that California seeks to use an
17  iron fist where the President has consistently chosen kid gloves." Id. at 427. The
18  Court finally pointed out that "Congress has done nothing to express disapproval of
19  the President's policy. Legislation along the lines of HVIRA has been introduced in
20  Congress repeatedly, but none of the bills has come close to making it into law." Id. at
21  429.

22       Garamendi did not consider the constitutionality of section 354.5 of the
23  California Code of Civil Procedure, a statute related to the HVIRA. Challenges to
24  Cal. Code Civ. Pro. § 354.5 were dismissed by the district court for lack of standing,
25  which decision the plaintiffs did not appeal. Section 354.5(b) provided that

26       Notwithstanding any other provision of law, any Holocaust victim, or heir or
27       beneficiary of a Holocaust victim, who resides in this state and has a claim
28       arising out of an insurance policy or policies purchased or in effect in Europe

1   before 1945 from an insurer described in paragraph (3) of subdivision (a), may

2   bring a legal action to recover on that claim in any superior court of the state for

3   the county in which the plaintiff or one of the plaintiffs resides, which court

4   shall be vested with jurisdiction over that action until its completion or

5   resolution.

6       Subsection (c) further provided that "[a]ny action brought by a Holocaust victim

7   or the heir or beneficiary of a Holocaust victim, whether a resident or nonresident of

8   this state, seeking proceeds of the insurance policies issued or in effect before 1945

9   shall not be dismissed for failure to comply with the applicable statute of limitation,

10  provided the action is commenced on or before December 31, 2010."

11      Following Garamendi, the California Court of Appeal struck down section

12  354.5 as unconstitutional.  See Steinberg v. International Com. on Holocaust Era Ins.

13  Claims, 133 Cal. App. 4th 689 (2005).  In Steinberg, the plaintiffs had submitted

14  claims to the International Commission on Holocaust Era Insurance Claims (ICHEIC)

15  to recover on Holocaust era insurance policies issued by Assicurazioni Generali

16  (Generali), an Italian insurer.  Id. at 692.  After the ICHEIC denied or diminished their

17  claims, the plaintiffs brought suit against the ICHEIC, alleging that ICHEIC's claims

18  resolution guidelines constituted unfair business practices under California law.  Id.

19  The plaintiffs filed suit relying upon section 354.5(c) as a basis for the tolling of the

20  statute of limitations on their claims.

21      Based upon its reading of Garamendi, the court in Steinberg concluded that "[a]

22  state may not enforce a statute which interferes with a specific interest of the federal

23  government. To have preemptive effect, the specific interest need not be expressly set

24  forth in an official agreement. An interest reflected in official agreements and

25  statements by executive branch officials is sufficient." Id. at 699.  The plaintiffs

26  argued that Garamendi should be distinguished because the plaintiffs' class was

27  "limited to policyholders and heirs whose claims were rejected by Generali, an Italian

28  company not subject to the executive agreements signed with Germany and Austria."

S:\CAS\Orders\CIVIL\2003\03-9407.dismiss.MunichRe.numbered.wpd                                   26

1   Id. at 700. However, the court rejected the plaintiffs' purported distinction as

2   irrelevant, stating that "[i]t is not the executive agreements themselves which dictated

3   the result in Garamendi, but the policy reflected in them, a policy which extends to

4   claims against Generali." Id.

5         As discussed, the Supreme Court in Garamendi declined to impose a rigid

6   distinction between conflict and field preemption, and instead suggests a sliding scale

7   depending upon the legitimacy of the state interest involved and the level of conflict

8   with federal policy. The Court finds this sliding scale approach to be instructive here.

9   Thus, if California has simply taken "a position on a matter of foreign policy with no

10  serious claim to be addressing a traditional state responsibility," then according to the

11  Court, field preemption may be appropriate. On the other hand, if California acted

12  within its "traditional competence" when it passed section 354.4(c), but "in a way that

13  affects foreign relations," a court should require a "conflict, of a clarity or

14  substantiality that would vary with the strength or the traditional importance of the

15  state concern asserted." Garamendi suggested, but did not decide, that the strength of

16  the federal foreign policy interest might also be weighed. The Court stated that "the

17  likelihood that state legislation will produce something more than incidental effect in

18  conflict with express foreign policy of the National Government would require

19  preemption of the state law." 539 U.S. at 420.

20        Plaintiffs contend that section 354.4(c) is within the California legislature's

21  traditional competence because it involves the application of a statute of limitations.

22  As discussed above, the Supreme Court stated in Sun Oil, in the context of conflicts of

23  law, that procedural rules such as statutes of limitations are within a state's traditional

24  area of competence.[13]  Munich Re responds that section 354.4(c) does not merely

25  apply a statute of limitations; rather, it revives previously time-barred causes of action

26  _____

27        [13]As discussed above, because the subsections of section 354.4 are severable, the
    Court considers only subsection (c), and expresses no opinion regarding the validity of
28  subsection (b) or any other provision of the statute.

1    that relate to "persons and subjects over whom states traditionally have *not* exercised

2    jurisdiction." Munich Re's Supp'l Reply at 3. As already discussed, state legislatures

3    have the power to retroactively extend statutes of limitations to revive previously

4    expired claims. Further, under <u>Sun Oil</u>, states may apply a local statute of limitations

5    to a claim governed by foreign substantive law particularly *because* the application of

6    such procedural rules is within a state's traditional competence. Thus, it appears that

7    section 354.4(c) is within the California legislature's traditional competence, and the

8    court should therefore examine whether a "conflict, of a clarity or substantiality that

9    would vary with the strength or the traditional importance of the state concern

10   asserted," exists in this case.

11          Accordingly, the Court next turns to the question of whether section 354.4(c)

12   conflicts with federal foreign policy. Munich Re contends that section 354.4 interferes

13   with an executive agreement between the United States and Germany in 1922 that a

14   Mixed Commission "determine the amount to be paid by Germany in satisfaction of

15   Germany's financial obligations under the treaty concluded between the two

16   Governments on August 25, 1921" ("the Claims Agreement"). 42 Stat. 2200. The

17   Mixed Commission created by the Claims Agreement had jurisdiction over "(1)

18   Claims of American citizens, arising since July 31, 1914, in respect of damage or, or

19   seizure of, their property, rights and interests, including any company or association in

20   which they are interested, within German territory as it existed on August 1, 1914; (2)

21   Other claims for loss or damage . . . as a consequence of the war; (3) Debts owing to

22   American citizens by the German Government or by German nationals." 42 Stat.

23   2200, art. I.[14]

24

25   ——————————

26          [14]Plaintiffs contend that the Treaty of Lausanne is relevant to the current dispute.
     The Treaty of Lausanne was signed by Turkey and various other states in 1923. However,

27   the United States is not a party to this treaty, and as such the treaty has no bearing on
     whether the foreign policy of the United States federal government conflicts with section

28   354.4.

1   Munich Re argues that the claims covered by section 354.4(c) are "World War
2   I-related" because it is a "historical fact" that "the 'Armenian Genocide' was attendant
3   to and related to the events of World War I," and therefore section 354.4(c) falls
4   within the purview of the Claims Agreement.  Munich Re's Supp'l Brief at 12.
5   Munich Re contends that it is irrelevant that "Armenian Genocide victims" were not
6   United States citizens at the time the Claims Agreement was passed.  Munich Re
7   further argues that even if section 354.4 would only be preempted as to claims against
8   German insurance companies, this fact is also irrelevant.
9       Plaintiffs respond that the Claims Agreement addressed only the claims of the
10  allied nations and their citizens, and did not address the recovery of losses suffered by
11  Germany or its ally, the Ottoman Empire.  Thus, plaintiffs argue, "the Claims
12  Agreement only pertained to individuals who were citizens of the United States during
13  World War I," and did not "address, nor constitute an expression of, foreign policy
14  regarding the myriad of other topics, including internal claims between allied citizens,
15  or claims involving parties who were not citizens of allied countries."  Plaintiffs'
16  Supp'l Opp'n at 9.
17      The Court concludes that section 354.4(c) does not conflict with the United
18  States' agreement with Germany pursuant to the Claims Agreement.  The Claims
19  Agreement simply did not apply to claims of citizens of the Ottoman Empire against
20  insurance companies arising out of insurance policies issued between 1875 and 1923,
21  regardless of whether those insurance companies are German companies.  Contrary to
22  Munich Re's argument, the Ninth Circuit's holding in <u>Deustch</u> does not warrant a
23  contrary result.  In <u>Deutsch</u>, the Ninth Circuit stated that

24          [i]t is immaterial that many of the Appellants are nationals of two nations,
25          China and Korea, that were not signatories of the San Francisco treaty.
26          When the United States has been a party to a war, the resolution it
27          establishes to that war is the resolution for the whole of the United States.

28

1         States lack the power to modify that resolution, regardless of the

2         citizenship of those seeking redress.

3   324 F.3d at 714 n.14.  The claims of the plaintiffs in <u>Deutsch</u>, however, pertained to

4   alleged World War II slave or forced labor, and therefore directly implicated the

5   United States' resolution of World War II.  In contrast, resolution of insurance claims

6   by "Armenian Genocide victims" was not part of the United States' resolution of

7   World War I.  Such claims where not within the contemplation of the United States

8   and Germany when they signed the Claims Agreement.  Indeed, section 354.4(c)

9   applies to claims relating to insurance policies issued as late as 1923, when the events

10  referred to by the California legislature as the "Armenian Genocide" ended, while the

11  United States entered into the Claims Agreement in 1922.  Thus, it does not appear to

12  the Court that the Claims Agreement with Germany has any relevance to the instant

13  litigation.

14        Munich Re next contends that the Executive Branch, during the administrations

15  of President William Clinton and President George W. Bush, has consistently

16  expressed a policy forbidding official United States recognition of an "Armenian

17  Genocide."  Munich Re's Supp'l Brief at 5.  Munich Re first points to the State

18  Department's opposition to a resolution considered by the House of Representatives in

19  2000.  This resolution would have formally acknowledged an "Armenian Genocide"

20  perpetrated by the Ottoman Empire.  <u>See</u> H.R. Rep. 106-933.  Regarding the

21  resolution, Executive Branch officials wrote letters expressing concern that "passing

22  judgment on this history through legislation could have a negative impact on

23  Turkish-Armenian relations and on our security interests in the region."  <u>See</u> Letter to

24  Dennis Hastert, Speaker, House of Representatives, From Secretary of Defense Bill

25  Cohen, Sept. 28, 2000, H.R. Rep. 106-933.  President Clinton also issued a statement

26  acknowledging the tragic "deportations and massacres of roughly one and a half

27  million Armenians in the final years of the Ottoman Empire," but expressing concern

28  about "the negative impact that adoption of this resolution will have not only upon

1    United States relations with Turkey, but on a wide range of U.S. national interests in

2    which Turkey is our active and necessary partner." Statement of the President, April

3    24, 2000, Armenian Day of Remembrance, H.R. Rep. 106-933.

4        In 2003, the House of Representatives considered another resolution

5    "Reaffirming support of the Convention on the Prevention and Punishment of the

6    Crime of Genocide and anticipating the 15th anniversary of the enactment of the

7    Genocide Convention Implementation Act of 1987 (the Proxmire Act) on November

8    4, 2003." H.R. Rep. 108-130. The resolution included a reference to the "Armenian

9    Genocide." Id. The Department of State expressed the Administration's opposition to

10    the reference to the "Armenian Genocide," and noted that "[w]ere this wording

11    adopted, it could complicate our efforts to bring peace and stability to the Caucasus

12    and hamper ongoing attempts to bring about Turkish-Armenian reconciliation." Id.

13        On March 7, 2007, Secretary of State Condoleeza Rice and Secretary of Defense

14    Robert Gates jointly wrote to Speaker Nancy Pelosi and Rep. John A. Boehner of the

15    House of Representatives, opposing another draft resolution that would formally

16    recognize the "Armenian Genocide." See Ex. A to Munich Re's Supp'l Brief.

17    Therein, the Secretaries note "our deep concern about the harm that passage of H. Res.

18    106 would cause U.S. efforts to promote reconciliation between Turkey and Armenia,"

19    and it "would also significantly endanger U.S. national security interests in the

20    region." Id. Munich Re contends that these Executive statements express the

21    "unambiguous nature of United States foreign policy regarding the 'Armenian

22    Genocide' issue," and that the California legislature's decision to pass section 354.4

23    clearly threatens to undermine that policy. Munich Re's Supp'l Brief at 8.

24        Plaintiffs respond that the federal government "has long recognized the fact that

25    the Armenian Genocide has occurred," although it chooses not to use that term.

26    Plaintiffs' Supp'l Opp'n at 3. Therefore, plaintiffs argue, "there is no official

27    executive branch policy not to take a position on the undeniable truth of the Armenian

28    Genocide." Id. at 5. Plaintiffs assert that the resolutions proposed by Congress are

1   distinguishable from section 354.4(c), in that the House resolutions would have

2   specifically directed the President regarding foreign policy, and could have been

3   interpreted as calling for the prosecution of those responsible for the "Armenian

4   Genocide." Plaintiffs further argue that, even if the Executive Branch has a policy not

5   to recognize the "Armenian Genocide," section 354.4 has no more than an incidental

6   effect on foreign policy.

7         The Executive Branch has expressed a preference that Congress not take an

8   official position as to whether the killing of Armenians in the Ottoman Empire was

9   "genocide," although the Executive Branch has long recognized the deportation and

10  killing of Armenians in the Ottoman Empire between 1915 and 1923. The Executive

11  Branch has expressed concern that taking a position on the "Armenian Genocide"

12  would undermine relations between the United States and Turkey, and jeopardize

13  national security interests. It does not appear to the Court that the federal government

14  has any policy regarding the resolution of claims for insurance benefits arising from

15  policies issued or in effect between 1875 and 1923 to ethnic Armenians residing in the

16  Ottoman Empire. As such, section 354.4(c) is distinguishable from <u>Garamendi</u> and

17  <u>Deutsch</u>, in which the federal government had implemented policies to deal with

18  Holocaust-related insurance claims and World War II claims. Thus, it appears that the

19  only aspect of section 354.4 that could arguably conflict with federal policy is the fact

20  that it refers to an "Armenian Genocide."[15]

21        As plaintiffs assert, other states in addition to California have official

22  recognized the "Armenian Genocide." Plaintiffs contend that thirty-nine states

23  including California have passed legislation or official proclamations recognizing the

24  "Armenian Genocide." Plaintiffs' Supp'l Opp'n at 3 (citing Armenian National

25  Committee of America, "Genocide Recognition by U.S. States,"

26  http://www.anca.org/genocide_resource /states_map.php). Munich Re does not

27

28        [15]Other California statutes also refer to the "Armenian Genocide," <u>see</u> Cal. Gov.
   Code §§ 6310, 6720, but are not at issue in the instant litigation.

1   dispute this contention.  Nor does Munich Re suggest that any of these statements,

2   much less section 354.4(c), have had any actual impact upon the United States

3   foreign policy, or that the Executive Branch has condemned these state efforts.

4   Indeed, although section 354.4 was passed in 2000, and this Court upheld the statute

5   in a previous case in 2001, there is no indication that the United States federal

6   government or Turkey have expressed opposition to section 354.4.  Accordingly, the

7   Court concludes that the federal government has not expressed a policy that the states

8   should take no position on the issue of the "Armenian Genocide," such that any

9   contrary legislation by the states is preempted.  While the Executive Branch may

10  prefer that Congress express no official, national position on the issue, the apparent

11  lack of concern about state recognition of an "Armenian Genocide" suggests that no

12  Executive policy on the issue exists as it pertains to the states.  Likewise, there is no

13  indication that section 354.4(c) has had any effect, incidental or otherwise, upon

14  United States foreign policy.

15       Munich Re correctly points out that "even in the absence of a treaty or federal

16  statute, a state may violate the constitution by establishing its own foreign policy."

17  Deutsch, 324 F.3d at 709 (internal quotation marks and alterations omitted).

18  However, the California legislature did not "establish its own foreign policy" when it

19  passed section 354.4(c).[16]  The legislative history of section 354.4, as discussed above,

20  shows that the California legislature specifically avoided any reference to Turkey in

21  the statute.  Rather, the legislature referred solely to the Ottoman Empire.  Further, the

22  legislature avoided expressing any condemnation of the Ottoman Empire or Turkey in

23  the statute.  Thus, section 354.4(c) contrasts sharply with the Oregon probate statute at

24  issue in Zschernig.  The Oregon statute in Zschernig, as discussed above, did not

25  conflict with any express federal policy.  However, the statute invited courts to make

26

27       [16]As such, even if section 354.4(c) could be said to fall outside of the California
28  legislature's traditional competence, the statute would not be subject to field preemption
    under the reasoning of Garamendi.

1    statements regarding the legitimacy of foreign governments, which could cause

2    embarrassment and difficulties for the federal government when dealing with those

3    countries.  In comparison, section 354.4 does not require courts to judge or condemn

4    the actions of any foreign government or official.  Unlike Zschernig, it is doubtful

5    whether section 354.4(c) would have any effect, much less an incidental effect, upon

6    United States foreign policy or relations with Turkey.

7         This decision is further supported by the Northern District of California's ruling

8    in Cruz v. United States, supra, which considered the constitutionality of Cal. Code of

9    Civ. P. § 354.7(c).  Section 354.7(c) extends the statute of limitations for claims

10   brought by "a bracero, [meaning any person who participated in a labor importation

11   program, known as the Bracero program, from 1945-1950 pursuant to agreements

12   between the United States and Mexico,] or heir or beneficiary of a bracero, arising out

13   of a failure to pay or turn over savings fund amounts."  The defendants, which

14   included the United States, Mexico, Mexican banks, and an American bank, argued

15   that section 354.7 is preempted under the foreign affairs doctrine.  The court first ruled

16   that agreements between the United States and Mexico in 1942 and 1943 did not

17   conflict with section 354.7(c) because these agreements did not preclude braceros

18   from pursuing judicial resolution of their grievances, and did not contemplate what

19   remedies would be available to braceros for such claims.  Cruz, 387 F. Supp. 2d at

20   1073.  The court further noted that, unlike Garamendi, "defendants here have not cited

21   any effort by the United States government to specify some other procedure for

22   resolving bracero claims."  Id. at 1074.

23        The court in Cruz next rejected the defendants' argument that field preemption

24   applied.  The court noted that "[a]n analysis of the relevant cases demonstrates that a

25   finding of field preemption here," where there was no actual conflict between the

26   statute at issue and a clearly articulated federal policy, "would go further than any

27   other court" that has applied Zschernig.  Id. at 1075.  The court explained, "[m]ost of

28   the cases cited by defendants as applying Zschernig involved state regulations which

1    amount to embargoes or boycotts . . . [in which] the state enactments not only used

2    state commercial power as a tool of foreign policy, [but] their mere existence

3    articulated state condemnation of a foreign nation's conduct by passing the statutes."

4    Id. at 1076 (internal quotation marks omitted).  The court reasoned that "[s]ection

5    354.7(c) does not fit comfortably into this mold.  By lifting the statute of limitations

6    for savings fund claims brought by braceros, California has not expressed its

7    condemnation of Mexico's conduct. Not only does the statute fail to mention Mexico .

8    . . but it also makes no predetermined judgment regarding Mexico's liability." Id.

9           The Court concludes that the reasoning of Cruz is equally applicable to this

10   case.  As discussed, section 354.4(c) does not mention Turkey or express

11   condemnation of Turkey, or any other country, in any way.[17]  Nor does this case "fit

12   comfortably into the mold" set by most cases applying Zschernig.  Section 354.4(c) is

13   not a form of economic sanction against a foreign country, and is not intended to

14   influence the affairs of Turkey, or any country.  Accordingly, the Court holds that

15   section 354.4(c) is not preempted by federal foreign policy pursuant to the foreign

16   affairs doctrine.

17

18   _____

19        [17]Contrary to Munich Re's argument, section 354.4 does not negatively implicate
     Turkey by association.  Munich Re relies upon language in In re World War II Era
20   Japanese Forced Labor Litig., 164 F. Supp. 2d 1160 (N.D. Cal. 2001), which was affirmed
     on other grounds by the Ninth Circuit in Deutsch.  The district court noted in In re World
21   War II Era Japanese Forced Labor Litig. that litigation dealing with alleged forced labor
     by Japan during World War II "cannot be carried to fruition without making 'unavoidable
22   judicial criticism' of the efforts of Japan and its war industry. . . . It seems beyond doubt,
     therefore, that the statute has the potential to have an impact on foreign relations between
23   the United States and Japan 'in a persistent and subtle way.'" Id. at 1175 (quoting
     Zschernig, 389 U.S. at 440).  The plaintiffs in that case sought compensation, pursuant to
24   Cal. Code Civ. P. § 354.6, for allegedly being used as forced or slave laborers by the
     Japanese government and Japanese companies.  In contrast, section 354.4 does not involve
25   claims against Turkey or its nationals for alleged past acts of the Ottoman Empire. Rather,
     the claims to be litigated in this action relate solely to plaintiffs' entitlement to insurance
26   benefits.

27

28

**E. Unjust Enrichment and Constructive Trust**

1                  Munich Re also argues that plaintiffs cannot maintain claims for unjust

enrichment and constructive trust. Munich Re contends that plaintiffs' "claim for

unjust enrichment collapses into their claim for imposition of a constructive trust."

Mot. at 23. Munich Re argues that California law does not recognize a cause of action

for unjust enrichment, citing McKell v. Washington Mutual, Inc., 142 Cal. App. 4th

1457, 1490 (2006). In Nordberg v. Trilegiant Corp., 445 F. Supp. 2d 1082 (N.D. Cal.

2006), the court noted that "[t]he state and the federal courts appear to be unclear

whether in California a court may recognize a claim for 'unjust enrichment' as a

separate cause of action." Id. at 1109. The court concluded that, "[n]otwithstanding

the apparent confusion over the viability of a cause of action for unjust enrichment, for

the most part, courts finding that California does not allow an 'unjust enrichment'

cause of action have made essentially semantic arguments--focusing on the

interrelationship between the legal doctrine of unjust enrichment and the legal remedy

of restitution." Id. at 1110. The court in that case chose to construe the plaintiffs'

claim as one for restitution, rather than unjust enrichment. The same conclusion

appears to be warranted here.

                  Munich Re also argues that plaintiffs' claim for constructive trust must fail

because they do not identify any res held by Munich Re to which plaintiffs are

entitled, and do not allege that the premiums paid by the insureds can be traced to

funds held by Munich Re. The Court agrees that plaintiffs have failed to state a claim

for constructive trust. Plaintiffs do not allege that the benefits owed are in a particular

fund held by Munich Re. Accordingly, plaintiffs' claims for constructive trust must be

dismissed.

\\\

\\\

\\\

1

**V.     CONCLUSION**

2      In accordance with the foregoing, the Court hereby DENIES Munich Re's

3   motion to dismiss plaintiffs' claims for breach of contract and breach of the covenant

4   of good faith and fair dealing, and GRANTS Munich Re's motion to dismiss

5   plaintiffs' claims for unjust enrichment and constructive trust.

6

7      IT IS SO ORDERED.

8

9   Dated:      June 6, 2007

10

11

12                                      _christina a. Snyder_

13                                    CHRISTINA A. SNYDER
                                     United States District Judge
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28